Filed 3/26/25  P. v. Madrigal CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081707 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD286055) |
| JUAN CARLOS MADRIGAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed and remanded with instructions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Christine Y. Friedman, and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juan Carlos Madrigal of first degree murder for shooting and killing Debron Moore, and of attempted murder for shooting at Moore's girlfriend, Moria Howard.  His primary arguments concern the

sufficiency of the evidence to support the jury verdict. He first asserts that any reasonable jury would have found he acted in self-defense or at least in the heat of passion. He also contends that, at a minimum, the jury could not fairly conclude that the killing was premeditated and deliberate. But applying the required standard of review, which is deferential to the jury's findings, we do not reweigh the evidence or evaluate whether other interpretations of the facts are equally plausible. Rather, we conclude the record adequately supports a finding that Madrigal instigated a deadly confrontation, pursuing Moore and threatening him with a gun before finally shooting him. These same facts allowed the jury to find that Madrigal engaged in sufficient planning and deliberation during his encounter with Moore to support his conviction for first degree murder.

Madrigal next claims the court committed reversible error by excluding evidence that the victim and his girlfriend might have stolen guns in a burglary committed the month before the shooting. Even assuming the trial court abused its discretion by excluding this evidence, Madrigal has not shown any reasonable likelihood this affected the outcome of his trial.

Madrigal further argues the court abused its discretion by denying his request for juror information, which he claimed was necessary to support his motion for a new trial. But the basis for Madrigal's request was his desire to question jurors about the influence of the prosecutor's closing argument on their verdict, which is inadmissible evidence. As we explain, the court properly denied both his request and the motion for new trial.

Finally, Madrigal contends (and the People do not dispute) that his abstract of judgment should be corrected to reflect 1,035 days of custody credit rather than 1,034. We correct the abstract of judgment in this respect, and otherwise affirm the judgment.

2

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On the evening of April 12, 2020, Moore (the eventual victim) and Howard (his girlfriend) argued as they left a family member's home. Moore followed Howard as she walked west on University Avenue toward the intersection with College Avenue. The argument turned physical when Moore "body slammed" Howard and "banged [her] on a car" near Alanberto's taco shop on the southeast corner of the intersection.

At trial, the prosecution showed the following aerial image of the intersection and the taco shop, which is where most of the pertinent events occurred:



A man parked by the taco shop with his family observed Moore battering Howard and tried to intervene. Moore responded by punching the man in the face multiple times. Howard, who had walked away from Moore, approached the group—which now included the man's family—and said, "if

---

1 Where there is inconsistent evidence, these facts are summarized in the light most favorable to the convictions in accordance with the standard of review applicable to Madrigal's first claims. We include additional facts for context or in connection with our analysis of other issues.

you don't fucking stop, I'm going to take that gun out of my bag." Howard testified she said this "[t]o scare them and make them stop," but that she did not actually have a gun. Within a few seconds, Howard began walking away again, heading south on College Avenue. Moore stopped fighting and apologized to the family.

Moore then approached an employee at the drive-through window of the taco shop and apologized for "the drama." As he was talking to the employee, he stepped backwards over the curb and into the street on College Avenue. Just then, a white truck driving down College Avenue in the right turn lane clipped Moore. Madrigal's brother was driving the truck, Madrigal was in the front passenger seat, and their friend was in a rear passenger's seat.

The truck stopped and reversed toward Moore. As the truck came to a stop, Moore pounded on the passenger's side door and yelled, "Hey, what the fuck. You just hit me." "Watch where you are going." Madrigal, whose window was open, yelled profanities at him. Moore walked backwards—away from the truck and the street—as he and Madrigal shouted obscenities at each other, including the N-word.

Madrigal brandished a gun out the window, pointing it down toward the sidewalk, and said "Oh, what's up [N-word]." Moore responded by saying, "I'm on what you on," and he grabbed his backpack as though to indicate "he was not backing down." Madrigal then pulled the slide back on the gun, chambering a round. He yelled to Moore, "What you want to do?"

Madrigal's brother drove forward on College, turned right on University, turned right into the taco shop parking lot, then drove through the lot and stopped at the exit perpendicular to College, almost circling back to their starting point. As the truck made its loop around the taco shop,

4

Moore took off running. When the truck stopped, Madrigal jumped out and chased Moore, carrying the gun. Madrigal returned to the truck, which turned onto College, drove around the corner again and entered the parking lot once more from the University entrance.

The truck stopped near the entrance at the north end of the taco shop parking lot. Madrigal and one or both of the truck's other occupants got out and once again chased Moore. A witness saw at least one gun among the group chasing Moore. Another saw three men exit the truck and push Moore, trying to get him to fight, and then start beating Moore while he was "trying to protect himself."

At this point, Howard, who had walked south on College Avenue while these events were unfolding, heard people yelling. She assumed Moore had gotten into another fight and ran back down College Avenue toward the commotion. As she got closer to Moore and Madrigal, she said, "Baby, what the fuck?" Madrigal was now close to the passenger side of the truck, Moore was standing a few feet away from Madrigal, and Howard a few feet further away from Madrigal, on the far side of Moore. Howard shouted something like "[b]ack the fuck up before I shoot your ass," and made a gesture with her purse to imply she had a gun. Moore yelled, "shoot him, baby."

Approximately five seconds elapsed between Howard shouting, "[b]ack the fuck up before I shoot your ass," and when the first shot rang out. In that time, Madrigal reached into the truck, grabbed the gun, made eye contact with Howard, and said either, "what's up now?" or "you ain't talking shit no more, huh?" He then fired at Moore and Howard. Witnesses who testified at trial heard or saw between three and six shots. Surveillance footage from that evening recorded what sounds like six shots.

5

Moore and Howard began running toward the street and then east down University Avenue after the first shot. Howard indicated that the two ran out of the parking lot and around the side of a neighboring building, marking their approximate path in red pen:



One of the bullets hit the wall of the ARCO gas station on the northwest corner of the intersection; an employee working that night heard the shot hit the building. Another bullet fatally struck Moore as he ran, entering his back and exiting through his left chest.

Madrigal and his companions fled in the truck. A few minutes later, an officer responding to the scene of the shooting saw the truck and began a

pursuit with his patrol car's lights and siren on. The truck ran multiple traffic lights and entered the freeway, leading the officer, another patrol unit, and a police helicopter on a chase. During the chase, Madrigal threw the gun out of the truck window into some brush, where it was later recovered.

Officers recovered four shell casings from the taco shop parking lot. A firearms expert testified that the casings had been fired from the gun Madrigal discarded. Investigators found gunshot residue on Madrigal's hands, indicating that he had recently fired a gun or touched a surface with gunshot residue.

Howard denied having a gun, and her hands did not test positive for gunshot residue. Law enforcement did not find a firearm or any additional shell casings besides the four that matched Madrigal's gun.

Madrigal was charged with first degree murder (Pen. Code, §§ 187, subd. (a)), attempted murder (Pen. Code, §§ 664, subd. (a); 187, subd. (a)); and shooting at an occupied building (Pen. Code, § 246). A jury found him guilty on all charges. The trial court sentenced him to an indeterminate term of 50 years to life.

## DISCUSSION

A. ***Substantial Evidence Supports Madrigal's Convictions for Murder and Attempted Murder***

Madrigal contends there was insufficient evidence to support his convictions for murder and attempted murder because any reasonable jury would have that found that he acted in self-defense or defense of others. Alternatively, he contends his murder conviction should be reduced to involuntary manslaughter because any reasonable jury would have found he acted in imperfect self-defense, or with the actual, but unreasonable, belief that self-defense or defense of others was required. Finally, Madrigal argues

7

his murder conviction should at a minimum be reduced to voluntary manslaughter because any reasonable jury would have concluded he acted in the heat of passion on adequate provocation.

1.    *Standard of Review*

"In reviewing the sufficiency of the evidence to support a jury's verdict finding a defendant guilty of a criminal offense, we apply the substantial evidence standard of review." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57.) We "view[ ] the trial evidence in the light most favorable to the prosecution and presum[e] every fact the jury could reasonably deduce from that evidence." (*People v. Pearson* (2012) 53 Cal.4th 306, 319.) We " ' "must accept logical inferences that the jury might have drawn from the evidence even if [we] would have concluded otherwise[.]" ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 811–812.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) "Reversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

2.    *Self-Defense or Defense of Others—Perfect and Imperfect*

"It is well established that the ordinary self-defense doctrine— applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773,

8

fn. 1.) The same is true with respect to Madrigal's assertion that he was at most guilty of manslaughter based on a theory of imperfect self-defense/defense of others. (*Ibid.*) Substantial evidence would support a conclusion that Madrigal created and escalated a confrontation to the point that Howard's intervention was legally justified. It was thus reasonable for the jury to reject Madrigal's claims of self-defense and imperfect self-defense.

Madrigal was the aggressor in his exchange with the murder victim, Moore. Moore posed no apparent threat to Madrigal or his companions in the truck, yet Madrigal continued to pursue him for several minutes in the vehicle and on foot as he tried to evade them. At the very beginning of the interaction, Madrigal brandished his gun and then chased Moore with it, threatening deadly force before any assertedly adequate provocation from Moore or Howard. One witness saw Madrigal assault Moore while Moore tried to protect himself.

Madrigal claims the shooting was a reasonable response to the threat apparently posed by Howard, who yelled "[b]ack the fuck up before I shoot your ass," and pantomimed a gun. But the jury could fairly conclude that, by the time Howard arrived, Madrigal had forfeited his right to use deadly force due to his own wrongful conduct in initiating and escalating the conflict with Moore. (Cf., e.g., *People v. Frandsen* (2011) 196 Cal.App.4th 266, 274–275 (*Frandsen*) [defendant who had imprisoned victims did not have the right to defend himself from victim's "lawful resort to self-defense and the defense" of another].) For this reason, it does not matter whether Madrigal believed Howard had a gun. Either way, the murder was not justified.

Madrigal cites *People v. Ramirez* (2015) 233 Cal.App.4th 940, 945 (*Ramirez*), a case about instructional error, in support of his argument that Howard's sudden resort to deadly force escalated the confrontation, reviving

9

his right to self-defense. *Ramirez* correctly holds that a defendant does not forfeit all right to self-defense if he "contrived to use . . . nondeadly force." (*Id.* at p. 953.) But "when a defendant contrives a 'deadly' assault [citation], there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-defense against those deadly measures." (*Id.* at p. 947.) Although Madrigal argues that witnesses did not see him point his gun at Moore or fire before Howard arrived, a witness testified that Madrigal not only brandished a loaded gun but chambered a round. Video played for the jury reflects the witnesses' contemporaneous concern that Madrigal intended to shoot someone. Madrigal was also seen to have the gun in his hand while chasing Moore. Given this evidence, we cannot conclude it was unreasonable for the jury to find that Madrigal was the first to threaten the use of deadly force.

Madrigal further argues "the prosecution failed to prove he did not withdraw" from his confrontation with Moore, claiming "[t]he record reflects that the altercation with Moore had ended, and Madrigal and his companions had walked back to the truck before Howard's threatening act of running toward him and threatening to shoot." Although Madrigal offers a string of citations, the portions of the record he references do not support his assertion. Although he points to the testimony of one witness who said Madrigal "retreated" to the truck, this witness clarified she just meant Madrigal was going back to the truck. The mere fact that Madrigal was returning to the truck does not tend to show that he had withdrawn, as he had been in and out of the truck throughout the encounter.

In addition, Howard testified that Madrigal had been chasing Moore just before he retrieved the gun and began firing. A different witness testified that the men were engaged in a yelling match right before the

10

shooting. A third witness testified that Madrigal was trying to fight Moore right before the shots. Thus, the jury could have reasonably concluded that Madrigal never withdrew from the confrontation.

3. *Heat of Passion*

Madrigal makes a similar sufficiency-of-the-evidence argument based on a heat-of-passion theory and, for similar reasons, it fails. He claims, "There was simply no evidence by which a rational juror could reasonably infer that an ordinary person in Madrigal's situation would have calmly assessed the circumstances, calculated the degree of risk posed by Howard—a person unknown to him, running toward him, across the dark parking lot, pretending to have a gun and threatening to shoot him, Moore also yelled for her to shoot—understood that there was no current imminent danger (assuming that this was true), cleared his mind of fear, and, in a dispassionate and rational frame of mind, in the seconds that elapsed, pulled the trigger." Again, Madrigal's argument focuses only on the moments after Howard appeared. When evidence concerning Madrigal's earlier actions is considered, it paints a different picture.

"A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.) As explained above, the record supports the conclusion that Madrigal provoked the altercation, continued to be an aggressor and, without seeking to withdraw, killed Moore. The jury reasonably rejected his heat of passion defense.

11

B.  *Substantial Evidence Supports the Jury's Findings of Premeditation and Deliberation*

Madrigal also claims there was insufficient evidence to support a conviction for first degree murder because a rational jury could not find premeditation or deliberation based on the evidence presented.  "If [a] murder is 'willful, deliberate, and premeditated,' it is first degree murder.  [Citation.] ' " ' "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.)  " ' " "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*In re Lopez* (2023) 14 Cal.5th 562, 580.)

The circumstances preceding the shooting constitute substantial evidence that Moore's murder was deliberate and premeditated.  Although their encounter was brief, the jury could reasonably find that Madrigal had sufficient time to reflect on what he would do to Moore in response to Moore yelling and pounding on the truck.  (*Cf. People v. Brady* (2010) 50 Cal.4th 547, 563–564 ["A rational trier of fact could have concluded defendant, knowing he illegally possessed a firearm, rapidly and coldly formed the idea to kill [a police officer] during the course of [a brief traffic stop], and therefore acted after a period of reflection rather than on an unconsidered or rash impulse."].)

As an initial matter, Madrigal "brought a loaded handgun with him . . . , indicating he had considered the possibility of a violent encounter." (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).)  Madrigal threatened Moore,

brandishing the gun, racking the slide, and saying, "What you want to do?" This implies that Madrigal considered the possibility of resorting to deadly violence, depending on Moore's response. (*Cf. People v. Steele* (2002) 27 Cal.4th 1230, 1250 [defendant's statement " 'Put the phone down or I'll kill you' " was "evidence suggest[ing] a planned killing"].) Furthermore, Madrigal was carrying the gun while chasing Moore on foot, suggesting he contemplated shooting Moore. And Madrigal retrieved the gun from his truck in the roughly five seconds before shooting, taking the time to jeer at Moore. The jury could find this showed he had the opportunity to reflect on his options even at this final juncture. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 (*San Nicolas*) [defendant's testimony that he saw victim's reflection in mirror before turning around and stabbing her established defendant had sufficient time "to have reached the deliberate and premeditated decision to kill"].)

Madrigal frames his arguments almost exclusively with reference to the factors outlined in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*). The Supreme Court has "found planning activity, preexisting motive, and manner of killing[, the so-called *Anderson* factors,] to be relevant, although these factors do not ' "exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." ' " (*People v. Lopez* (2018) 5 Cal.5th 339, 355.)

When viewed with reference to the *Anderson* factors, the evidence amply supports a finding that Madrigal spent at least some time planning the killing. Evidence of "planning" includes "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing." (*Anderson, supra*, 70 Cal.2d at pp. 26–27.) As already discussed,

13

Madrigal's actions prior to the killing support an inference that the murder was planned.

The other two factors—motive and manner of killing—are less strongly indicative of premeditation and deliberation, but are nonetheless consistent with the jury's verdict and the guidelines of *Anderson*. (See *San Nicolas, supra*, 34 Cal.4th at p. 658 ["Evidence of the *Anderson* factors need not be present in order to support a finding of deliberation, but planning, or motive in conjunction either with planning or with manner of killing, must be present to support such a finding."].) With respect to motive, although Madrigal's precise reason for wanting to kill Moore was unclear, the jury could have reasonably concluded he was motivated by his ego, perhaps intent on retaliating for perceived disrespect by Moore. There is evidence that Madrigal was intent on chasing Moore down even though Moore sought to disengage. This suggests Madrigal sought retribution for Moore's intemperate reaction to being hit by the truck.

Madrigal argues he could not have had a motive because he did not know Moore before the confrontation. But motive can be quickly developed. For example, in *Brady*, the Supreme Court upheld a first degree murder conviction where the defendant killed a police officer mere minutes after first encountering him. (*Brady, supra*, 50 Cal.4th at pp. 562–563.)

Madrigal broadly asserts that anger arising "on the spot because of a confrontation is not a premeditated motive to kill." But there is no such categorical rule. (See *Lee, supra*, 51 Cal.4th at p. 636 [defendant's frustration that a girl "refused to have sex with him" right before killing was motive supporting conviction for first degree murder].) We look to any "facts about the defendant's . . . conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim." (*Anderson, supra,* 70 Cal.2d at

14

p. 27.)  "Motive is the emotional urge that induces a particular act."  (1 Witkin, Cal. Criminal Law (5th ed. 2024) Elements, § 4.)  " '[T]he law does not require that a first degree murderer have a "rational" motive for killing.' " (*People v. Jackson* (1989) 49 Cal.3d 1170, 1200.)  Again, the jury could have reasonably concluded Madrigal was angered by Moore's reaction to being hit by the truck and therefore decided to kill him.  (See *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 ["Anger at the way the victim talked to [the defendant] [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine[,]' may be sufficient."].)

Finally, the manner of killing is also consistent with premeditation. Because the record supports that Madrigal retrieved his gun from the truck before shooting, the jury could have reasonably concluded that this was evidence of reflection.  Even though Moore and Howard fled as soon as he began shooting, Madrigal fired multiple shots.  The weapon used by Madrigal was semi-automatic, meaning he had to pull the trigger to fire each shot. One shot ended up in the gas station to the northwest of Madrigal and one in Moore's back as he ran northeast of Madrigal, indicating that Madrigal was tracking the victims with his shots as they ran away.  Firing multiple shots in the direction of the fleeing victims is consistent with a plan to kill.

In sum, although other interpretations are possible, substantial evidence supports the jury's conclusion that Madrigal's killing of Moore was deliberate and premeditated.

C.  ***Any Error in Excluding Evidence Related to Victims' Prior Burglary and Firearm Offenses Was Harmless***

1.  *Additional Background*

Moore, Howard, and a third person committed a residential burglary roughly a month before the shooting.  Madrigal sought to show that Moore

15

and the other person had stolen two guns in the burglary. He also offered evidence that Moore had been charged with possession of a firearm in connection with that offense.

The court ruled that Howard's aiding and abetting the burglary was admissible as a prior crime of moral turpitude, but excluded the fact that firearms were stolen. The court said it was tenuous to assume Howard had access to guns taken in the burglary because she was just the getaway driver. Consistent with Evidence Code section 352, it reasoned that the evidence was minimally probative but could lead to undue consumption of time and confuse the issues. The court also questioned the relevance of Moore being charged with theft of a firearm since his credibility was not an issue.

The trial court permitted Madrigal to present other evidence suggesting that Moore and Howard may have procured a gun, including a picture of a gun Howard texted to a friend the day before the shooting. When questioned about it by defense counsel, Howard said, "I also have a picture of full photo of that being a screenshot. I got that off of Facebook and I still have the phone that has the full photo that's a screenshot. I cropped half of it out. . . . As you could see, someone is holding a picture—someone is holding a cell phone and the gun is not real. It was a joke on Facebook and I screenshot it and cropped around it."

Howard sent the same picture to Moore, along with the message "Dis n**** trying to sell this to me at the tattoo [party.]" Moore responded, "[W]hat tattoo party[?] that shit look stupid." Howard said she messaged Moore about buying a gun because she "was just trying to get his attention."

In a separate conversation that evening, Moore messaged Howard saying, "I need a strap." Howard testified that "strap" is slang for gun.

The defense also submitted the following Facebook Messenger exchange from Howard's phone, dated that same day:

"[Howard's cousin]:  Yooo

"[Howard's cousin]: It still work

"[Howard]: U dead ass wanna buy it? I posted it cause I thought it was funny

"[Howard]: Someone tried to sell the lay bs to my friend

"[Howard]: It's for sale tho

"[Howard's cousin]: What it's going for I collect guns just asking"

Howard said she did not know about this conversation and claimed she shared her phone with Moore.

In addition, some witnesses believed Howard may have had a gun with her that night.  The man Moore had punched a few minutes before the shooting thought he saw Howard holding something "black and . . . pointed" right before shots were fired, but could not say if it was a gun, and he was not sure who had fired.  His daughter said she believed Howard was shooting at the family's car—which she said was in the intersection of College and University at the time of the shooting—because she saw bullets hit the gas station and thought it made sense based on Howard's location.  Although she testified "it could [not] have been anyone else that shot" given the positioning of the various parties, her memory of where Madrigal's truck was stopped is inconsistent with the surveillance footage.  The daughter's boyfriend testified he thought Howard might have been shooting from a dark spot in the parking lot.  But he did not articulate his reason for believing this, he did not see Howard at the time of the shooting, nor did he see anyone holding a gun.

Another witness told officers on the night of the shooting she believed Howard was shooting from the ground and may have put the gun in her

17

purse or a car she was standing near.  In a later statement to police, though, this witness said Madrigal was the only shooter, and she testified at trial she was "confident" there had only been one gun and one shooter.

2.  *Standard of Review*

We review a trial court's decision to exclude evidence for abuse of discretion.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)  The decision to exclude evidence " 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].' "  (*People v. Peoples* (2016) 62 Cal.4th 718, 745.)  Exclusion of evidence only constitutes reversible error if there is a "reasonable probability that defendant would have obtained a more favorable outcome had he been permitted to introduce [the] evidence."  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828 (*Gutierrez*).)

3.  *Analysis*

Madrigal argues the trial court abused its discretion by excluding evidence about the guns taken in the burglary and that Moore was charged with possession of a firearm.  He claims this evidence "directly impeached Howard's credibility and provided circumstantial evidence supporting other percipient[ ] [witnesses'] perception that Howard had a gun on the night of the shooting."  We need not decide whether the trial court properly excluded the burglary-related firearm evidence because, even assuming the court abused its discretion, there is no reasonable probability that Madrigal would have obtained a more favorable result had the evidence been admitted.  (See, e.g., *People v. Merriman* (2014) 60 Cal.4th 1, 69.)

Although Madrigal argues this evidence was relevant to Howard's credibility, Howard frankly admitted she had lied on multiple occasions regarding the night of the shooting:

18

"Q. Had there been prior occasions when you have been asked to talk about this case and that you have not been fully truthful?

"A. Yes, ma'am.

"Q. Okay. And is the preliminary hearing one of them?

"A. Yes, ma'am.

"Q. And some of your interviews with the officers, did you deny things that then you admitted at the prelim or that you are admitting today?

"A. Yes, ma'am."

This is significantly stronger credibility evidence than the material the court excluded.

Madrigal also argues this evidence could have convinced the jury that Howard in fact had a gun with her that night. But there was already a significant amount of other evidence suggesting that Howard and/or Moore had access to firearms or at least an interest in acquiring them. The jury heard from witnesses who thought Howard may have fired a gun, and the defense introduced Howard's and Moore's messages sent the day before the shooting, making the burglary-related evidence cumulative. (See *Gutierrez, supra*, 45 Cal.4th at p. 828 [no reasonable probability of a more favorable outcome if trial court had admitted evidence of victim's misdemeanor battery conviction where defendant "was permitted to testify regarding his past fights with the victim," "the tumultuous nature of their relationship," and "the altercation that occurred between defendant and the victim on the day she was killed"].)

In fact, the evidence regarding the firearms used in the burglary could just as easily have confused the issue. If Moore and Howard already had a gun from a burglary committed a month before, it undercut the salience of

Moore's message, "I need a strap," and Howard's apparent messages about buying a gun. In other words, if the defense theory was that Moore and Howard already had a gun from the burglary, their messages about procuring a gun the day before the shooting make much less sense.

Moreover, whether Howard in fact had a gun was not especially significant. Madrigal's defense was almost entirely consistent with Howard's version of events, as she admitted she threatened to shoot him and pretended to have a gun. Madrigal only needed to reasonably *believe* she had a gun to claim self-defense, something the jury could have easily concluded from evidence presented at trial. (See *People v. Ceja* (1994) 26 Cal.App.4th 78, 86 [" 'To be exculpated on a theory of self-defense one must have an honest and reasonable belief in the need to defend.' "].)

For these reasons, we conclude Madrigal's defense was not prejudiced by the exclusion of this evidence.

D.  ***The Trial Court Properly Denied Madrigal's Request for Juror Information and the Related Motion for New Trial***

1.  *Additional Background*

At trial, the prosecutor highlighted the surveillance footage, urging the jury: "And take a listen to, when you're determining how many gunshots, consider whether there are four and an echo, or are there six? I listened to that thing ten million times. You will only have had two or three chances. Take the time to listen when you're trying to determine what the facts are, and look at what on that video is corroborating what the witnesses say happened."

After trial, Madrigal's counsel encountered Juror No. 5 by chance outside a restaurant and he "informed [her] that the jury did not believe that Ms. Howard had a gun" and "that the jury believed that the two additional

20

'shots' [heard on surveillance footage] could have been from an echo." According to Madrigal, this demonstrated the jury relied on the prosecution's statement in closing argument rather than the evidence and could have supported a motion for a new trial. Madrigal sought disclosure of juror contact information pursuant to Code of Civil Procedure section 237, subdivision (a)(1), presumably seeking to ask other jurors about the effect of the prosecutor's argument on their verdict.

The court held a hearing on Madrigal's request and questioned Juror No. 5 about his discussion with defense counsel. The juror did not corroborate counsel's version of the conversation, saying he had not discussed the number of gunshots with counsel, and he did not remember discussing whether Howard had a gun or his desire to have an audio expert address the question of echoes. The court found Madrigal had not made the required prima facie showing of good cause for disclosure of juror information.

Although his request for juror information was denied, Madrigal nonetheless filed a motion for new trial on two grounds. First, he claimed the prosecutor committed misconduct in her closing argument. The trial court rejected Madrigal's request for a new trial on this ground, first noting there had been no objection from defense counsel, potentially for the tactical reason of not highlighting a stray comment. As a result, it found the objection had been forfeited. The court further concluded, in context, the prosecutor was not asserting that *she* heard four shots and an echo, but that the jury should listen carefully to the audio and draw its own conclusions. It suggested the jury was entitled to draw any reasonable inferences it wanted from the gunshot evidence, including potentially that there had been echoes. The court finally noted the prosecutor made only one reference to a potential echo and the defense had an opportunity to respond in its closing.

21

Second, Madrigal argued that an expert report analyzing audio of the gunshots constituted newly discovered evidence. The trial court concluded the proffered evidence was not newly discovered, stating, "the only thing that is new is an interpretation by an expert." The court also found that the evidence would have been cumulative in some respects "because . . . the issue was, were there six shots or four shots, because the other two shots had to be Ms. Howard's gun"; that the evidence would not likely change the result in the event of a new trial; and that the defense could have discovered this evidence with reasonable diligence.

2. *Request for Juror Information*

A defendant may petition the court for access to jurors' names, addresses, and telephone numbers. (Code Civ. Proc. § 237, subd. (b).) "The petition [must] be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's . . . information." (*Ibid.*) If the petition establishes a prima facie showing of good cause for the release of the juror information, "the court shall set the matter for hearing." (*Ibid.*)

Madrigal's petition failed to establish a prima facie showing of good cause. The basis for Madrigal's request was a conversation between defense counsel and Juror No. 5 concerning what the jury "believed" and "did not believe." This evidence was not admissible in support of Madrigal's request for a new trial, as it concerns "the mental processes by which [the verdict] was determined." (See Evid. Code, § 1150, subd. (a) ["No evidence is admissible to show the effect of [a] statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."].)

Madrigal contends the trial court erred by holding a hearing at which only Juror No. 5 was questioned and improperly relied on this testimony in

22

rejecting Madrigal's application. But the court indicated it had already denied the request before talking to the juror. It also appears that defense counsel expressly acquiesced to the court's approach:

> "[COURT]: [W]hat we had outlined before is that I'm going to just set it up and indicate that [Juror No. 5] apparently had an opportunity to have a discussion with defense counsel, and we'd like to know how that developed and what was said. And then, at that point, we are going to mute him again and figure out where we go from there.

> "Unless somebody has anything else specific that you want me to address now, I'm thinking that's the better approach.

> "Defense?

> "[DEFENSE COUNSEL]: That's fine, Your Honor."

In any case, no "new trial [shall be] granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Madrigal sought the release of juror information to obtain inadmissible evidence concerning the jurors' mental processes. He therefore cannot show that any procedural error by the trial court affected the outcome of his motion for a new trial.

### 3. *Prosecutorial Misconduct*

Madrigal claims the prosecutor's closing argument improperly and prejudicially introduced a fact not supported by the evidence—the notion that two of the gunshots heard on the surveillance footage were an echo. He also

argues the prosecutor improperly inserted her personal opinion as fact by suggesting that she had listened to the recording "ten million times."

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) " ' "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citation.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' " (*People v. Adams* (2014) 60 Cal.4th 541, 577 (*Adams*).) The court must consider the challenged statements in the context of the argument as a whole. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.)

A defendant forfeits a claim of prosecutorial misconduct by failing to object. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1043.) As Madrigal concedes, he failed to object to the prosecutor's allegedly improper statements. In our view, he "fails to show why an objection and admonition would have been futile." (*People v. Blacksher* (2011) 52 Cal.4th 769, 829 (*Blacksher*).)[2]

Even if the issue had not been forfeited, Madrigal has not shown " ' "a manifest and unmistakable abuse of . . . discretion." ' " (*People v. Lightsey*

---

2    Contrary to Madrigal's assertion, *Blacksher* does not support that the California Supreme Court "has chosen to consider prosecutorial misconduct claims on the merits even where the defendant failed to object at trial and did not show that objection would be futile." In *Blacksher*, the court rejected a defendant's claim of prosecutorial misconduct in the alternative "even assuming [he] ha[d] not forfeited this claim." (*Blacksher, supra*, 52 Cal.4th at p. 829.) We similarly address the merits of Madrigal's claim in the alternative.

(2012) 54 Cal.4th 668, 729 (*Lightsey*).)  The evidence supported that there was a discrepancy in the number of shots, with witnesses reporting between three and six.  Four casings were recovered, while the surveillance footage audio apparently reflects the sound of six shots.  " 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Wilson* (2005) 36 Cal.4th 309, 337.)  The thrust of the prosecution's argument was that the jury should carefully review the evidence for itself, and her suggestion of an echo was at least arguably a fair inference from that evidence.

In any case, even if it crossed the line of impropriety, there was no reasonable likelihood the jury understood or applied this single remark to suggest there was direct evidence of an echo.  The prosecutor told the jury to decide for themselves what they heard.  The court instructed the jury, "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence . . . ."  "Jurors are presumed . . . to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  We therefore presume the jury drew its own conclusions from the evidence.  (*See Adams, supra*, 60 Cal.4th at p. 577.)

For all these reasons, we find no abuse of discretion in the trial court's decision not to grant a new trial on the ground of alleged prosecutorial discretion.

4.    *Newly Discovered Evidence*

Madrigal also argues the trial court should have granted his motion for a new trial based on a newly proffered expert report from a forensic analyst

who opined that the surveillance footage reflected six gunshots and not echoes.

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) " 'In addition, "the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable." ' " (*People v. Howard* (2010) 51 Cal.4th 15, 43.)

Again, Madrigal has not shown a " ' "manifest and unmistakable abuse of . . . discretion." ' " (*Lightsey, supra*, 54 Cal.4th at p. 729.) Assuming the expert's report constitutes "newly discovered" evidence, the opinions were based entirely on evidence available to Madrigal before trial, and there is no apparent reason this evidence could not have been developed earlier and presented at trial. Madrigal argues that because there was no direct evidence of an echo, he had no reason to investigate the "echo theory" until the prosecution's closing argument. As the trial court mentioned, however, both Madrigal's claim of self-defense and the number of gunshots were squarely in dispute. Madrigal knew that Howard denied having a gun that night and that the prosecution's version of events did not account for two of the six shots heard on the surveillance footage. Madrigal thus had sufficient

26

reason to investigate whether all of the sounds on the surveillance footage audio were gunshots or something else.

Moreover, the assertedly "new" evidence is largely cumulative. The audio from the surveillance footage does not sound like four shots and two echoes, it sounds like six shots. One of the prosecution's own witnesses—an investigating detective—testified that he believed there were six shots on the surveillance footage. Because the report is essentially cumulative, we see no abuse of discretion in the trial court's conclusion that the report was not likely to affect the outcome on retrial.

Finally, as we have already noted in a different context, the viability of Madrigal's self-defense or imperfect self-defense claims did not depend on the jury believing that Howard actually possessed and fired a weapon. It was enough that Madrigal subjectively believed his life was in danger. (*Ante,* p. 23.)

E.     *The Abstract of Judgment Shall Be Corrected*

Madrigal argues, and the People do not dispute, the abstract of judgment fails to accurately reflect Madrigal's custody credits. The probation report states in the narrative that Madrigal was arrested on April 29, 2020, but uses April 30, 2020, to calculate his custody credits. The parties only cite one mention in the record of Madrigal's arrest date, testimony from his mother that he was arrested on April 29. It thus appears there is a clerical error in the probation report. This court may correct clerical or arithmetical errors regarding presentence credits without the necessity of a remand. (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 235–236.) In light of the apparent clerical error and the People's concession, we will order the judgment modified to reflect an extra day of credit.

## DISPOSITION

The judgment is modified to reflect that defendant is entitled to 1035 days of actual presentence custody credit. The clerk of the superior court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting this modification.

As so modified, the judgment is affirmed.

DATO, Acting P. J.

WE CONCUR:

BUCHANAN, J.

CASTILLO, J.

28